We'll hear argument next in appeal number 06-5039 Markovich v. Department of Health and Human Services Mr. Kruger, good morning. Welcome to you and we'd like to begin as soon as you can be ready. This case, your honor, the previous decisions issued by the lower courts, I believe those decisions defeated the Vaccine Act's purpose to provide non-adversarial, equitable responses to vaccine-related injuries. This case involves two specific dates, two events. We have the facts pretty well in mind. When did you enter the case? Prior to filing the petition. Well, obviously. How much prior? Without looking through my file, your honor, I would say roughly six to nine months. So did you assume that the August 30th date of the gross seizure was necessarily the trigger of the running of the filing deadline? Absolutely, your honor. And what could you have based that on? Well, what I knew at that time and what the courts knew is that on August 30th of 2000, while they were taking Ashlyn from the bathtub, she had 20 minutes, an episode where her arms and legs were violently shaking and jerking. They rushed her to the hospital. That was the first indication to anyone, including the parents or myself, that there was an injury. But they go to the doctor a year later and the doctor says eye blinking is actually the first onset. And the mother says, oh yeah, yeah, yeah, yeah, that happened earlier. She, in her affidavit, confirms this July onset. Why, at that point, she still had two years to file. Why didn't it happen? Your honor, I can't tell you why at that particular point. All I know is... They had two years from the point that the doctor says to them, eye blinking is the real event. And the mother says, yeah, yeah, I remember that, that was July. And so everybody's kind of at that point aware something happened earlier. And there's two more years to file and it doesn't happen. That's what we've got to grapple with. Yeah, I understand. What Mrs. Markovich tells me, who's a registered nurse, she tells me up until after this thing was filed, until after we filed our petition, she said, I thought she was simply tired. This wasn't an episode of an episode where there was eye fluttering. Wait a second. Don't we, in this case, have multiple physician diagnoses in the months following that August 30th first seizure? Which diagnoses and physician reports make it very clear that this child had absolutely awful seizures that happened all the time, that resisted medication, that were severely impacting her ability to learn and develop as a normal child. And all this was happening within six months of the first seizure. And in the report of the Mayo Clinic doctor, I forget his name, he specifically says that the eye blinking proved seizures. And the mother all along has said, and we have no reason to doubt it, that the eye blinking type behavior started the very day of the vaccination, which I think was July 12th. So I'm completely at a loss, given that physician's report early on, within less than a year, why it wasn't crystal clear that the operative trigger for the three year statute of limitations was the July 12th seizure as seen by eye blinking, not the August 30th growth seizure. Well, first of all, I am not sure that Mrs. Markovich understood when that was told to her, that that is something that she needed to be concerned with. She was dealing with a child after August 30th who had multiple serious seizures. Nobody is faulting the mother's reaction before August or after August. All I'm saying is, the family obviously got extensive workups done on this child by many, many different doctors because this poor child kept having horrendous seizures. And included in those reports within the first six months was a diagnosis that absolutely states that the eye blinking incidents themselves were the onset of seizures, were a type of seizure. Now, when the family had that much within six months, what more would anybody need to know that this disorder started on July 12th, not on August 30th? Well, the point is, with respect to the mother, is whether or not, to be quite honest, Your Honor, I am trying to recall Mrs. Markovich's position in this regard. Let me read it to you. Okay, thank you. I am now aware that she, my daughter, may have been having seizures between the time of the immunization and the August 30th events. She was having seizures, Mrs. Markovich realizes, before August. I believe... She understood what the doctors understood. Well, and Dr. Corbier, who testified in this case, said that he can't link that July 10th, the day of the vaccination, and the day of the eye blinking episode. Dr. Corbier can't link that to a seizure. He says the only reason he claims there was a seizure on July 10th, or that that was the beginning, was to the benefit of hindsight because of the seizure that occurred on August 30th. Weren't the Mayo doctor's reports also in the record before the special master? They certainly should have been, yes. So those doctors didn't testify live, and Corbier did, but their reports were in the record. Right. And the reports seemed to show a diagnosis of seizures in July, as evidenced by what we're calling the eye blinking. So the family had that. They had that long before they came to you. Seems to me that that should have told them and you that the onset date was July 10th or 12th, whichever it is, not some later date, and therefore, together, you should have known that you could not file later than three years from July 10th, 2000. Your Honor, as far as I know, no doctor has diagnosed the July 10th eye blinking episode as a seizure. But is a medical diagnosis required? On that point, Dr. Neurologist Randa G. Gerrar reported that Ashland experienced four types of seizures. Number one, repeated eye blinking. I'm reading from the record. Yes. Eye blinking is a type of seizure.  And Dr. Corbier aptly stated that had the August 30th event not occurred. But this is occurring in 2002 with plenty of time, two years at least, to make a filing. Based on, and I believe, Your Honor, that had the August, that would be consistent then with had the August 30th event not occurred, would there have been enough information to file a claim based on the July 10th indication or the event where the child is sleepy? Well, wait a minute. That's not a fair hypothetical. We all know that two months later the August 30th grand seizure did occur. So you had the combination of the eye blinking since the day of the inoculation and the grand seizure and the diagnostic findings that Judge Rader has just recited. Now, when you have all those three things, why isn't it crystal clear that the legal clock runs from the July date, not the August date? Because, well, two things, Your Honor, in that regard. First of all, there has to be, with respect to the July 10th, and again, I do not believe Mrs. Markovich was under the impression at any time prior to filing this claim that her daughter suffered an injury on July 10th. Maybe not, but she should have been because the Mayo doctor so found. She had the report from that Mayo doctor. She sought the diagnosis. Quite understandable. I don't know if she had the report, and I can, to be quite honest, I'm sure she didn't have the report. She met with the doctor. What was discussed in that conversation with the doctor at the Mayo Clinic and what she was told versus what's in a record, they're not always the same. I've been doing this for over 22 years, personal injury work, and I know that records… I wouldn't claim, I wasn't asserting that what the doctor told her orally was verbatim what the doctor's written report stated. What I suggested is that the parents would have been collecting each and every doctor's report as they were generating. Mr. Kruger, aren't you really kind of caught in a bind here? You really do have to tie, in order to get on the table, you do have to tie the onset of the event to a time period within three days of the vaccination. So you really do need to recognize that the eye blinking was the onset. For one purpose, and then for another you need to disclaim it. Isn't that a little difficult? Well, we're not claiming a table injury, Your Honor. We are claiming that the August 30th event is a non-table injury. What happened in this case is, and the primary thrust of Dr. Corbett's testimony was on causation. He is linking after the fact that that eye blinking episode that the parents thought she was tired. But causation was not the issue. The special master held a hearing only to explore the date of onset because there was an apparent problem of late filing. And then you chose to call this Dr. Corbett as the sole live witness at the hearing where, in effect, you had the burden of proving that the filing was not late. Right, Your Honor. So I don't see why you should be allowed to complain that, oh well, he wasn't talking about onset, he was just talking about causation. He was called to that hearing only to talk about onset because onset was the only issue in front of the body. What happened in this particular case is that we have a non-tabled injury, and that was our claim. The government's position was, hold it. If you're going to argue causation, and you're going to bring up that July 10th event, then we're going to say it was too late. We're going to say that that's when the injury occurred. Which is why the special master said, hold it, we'd better find out when the onset was. Dr. Corbett's testimony, when you look at what he testified to with respect to the statute of limitations as opposed to causation, you said it's possible the eye blinking episode was a seizure. Eye blinking by itself does not warrant a diagnosis of a seizure. Not certain that the eye blinking was a seizure. We've read the testimony. He waffles on several points. But he ends up saying it's either a seizure or it's a similar brain dysfunction. So that means whatever it means. Do you want to save the remainder of your time for rebuttal? Let me ask my question first. The statute talks about the clock starting on the statute of limitations on the date of occurrence of the first symptom or manifestation of onset of injury. Does that require a medical diagnosis? Well, Judge Braden said that if this got in front of this court, that the court should consider setting some type of medical documentation or diagnosis so that everyone knows for certain when the clock starts. However, I don't think the court needs to go that far. I think that when the event occurs, a parent must have an understanding that there was an injury, not necessarily related to the vaccine, but just something different than their child being sleepy. Which is, to use the language of the statute, something that manifests the onset of an injury. Right, and manifest means open, obvious, something that is known to the senses. As opposed to a parent where their child is two months old, is sitting at the table, and is now blinking their eyes like they're tired. And given, that would have been one of the warnings she would have received when she had the immunization. Which is, one of the side effects might be your child is sleeping. Nobody says, if that happens, you better be concerned that there's a seizure disorder occurring here. OK, thank you. Thank you, sir. Thank you, sir. We'll let you have your two minutes of rebuttal. Ms. Ricciardella, good morning. Good morning. Welcome. May it please the court. Again, my name is Lynn Ricciardella from the Department of Justice, representing the Secretary of Health and Human Services. Your Honor, it's a straightforward application of Section 1682 of the Act requires dismissal of this case. The issue before the court is one of statutory interpretation. What constitutes the first symptom or manifestation of onset of injury? And I'd like to pick up where Mr. Kruger left off. Is it a subjective standard that looks at the mindset of a petitioner in a given case? Well, I thought we knew the answer to that. I thought the case law focuses on the medical facts, not the subjective perception of a given parent. Absolutely. The case law says it's an objective standard. You look at what the medical community as a whole deems to be the first symptom or onset of injury. Ms. Ricciardella, have you had a chance to look at the alternative reading of this statute presented by Judge Butte in another case? Yes, sir. He reads the language first symptom or manifestation to say that the first symptom might be this medical evidence, but the manifestation might be something different. It might be when the normal person would have perceived the illness to have been manifested. Is there a distinction in the statutory language that this court should take cognizance of? As we've discussed in detail in our brief, with all due respect to Judge Butte, we disagree with his reading and interpretation of Section 1682. He, in essence, suggests that you could take the latter of the two events, symptom or manifestation, whatever is clear, obvious, overt. That is just not the language of the statute. If you look at what the Supreme Court said in White-Cotton, the emphasis should be on the word onset, not on symptom or manifestation. Yes, there can be distinctions between symptom and manifestation given a particular injury or a particular disease, but the emphasis should be on what is the first evidence of that onset, not necessarily what is the first symptom or the first manifestation. For instance, take the injury of heart disease. I'm not quite catching your White-Cotton point. Why would the Supreme Court have told us to look at onset rather than manifestation? That's exactly what the Supreme Court says. I quote directly, the key to understanding the heading. Now, again, they're not talking about Section 1682. They're talking about the table, the vaccine injury table, but the language is the same. The Supreme Court says the key to understanding the heading is the word onset. And the Supreme Court throughout the White-Cotton opinion conflates the words manifestation and symptoms and talks about what is the first evidence of injury. What's your point? My point is that Judge Fute is really focusing on a distinction that's not really there. It's in the statute. What do you mean it's not there? Where is it not? It's right in the face of the statute, A or B. Your Honor, Congress chose to include the words symptom and manifestation to be inclusive, not exclusive. You can have an injury. You can have the first symptom showing onset of injury, and then you can also have an injury that the manifestation is the first evidence of injury. If I could give the Court an example, it's heart disease. You could have shortness of breath or feel lightheaded. That could be a symptom of heart disease. But just looking at that alone, you don't know what you have. It's only later when you go to the doctor and have some other tests that you find out you have heart disease. But no one can say that those are not symptoms of heart disease. Take the same injury. You could be asymptomatic. You could have heart disease, be asymptomatic. You go to the doctor for a routine physical examination. You have an EKG, and it shows an irregular heartbeat. That would be a manifestation of your heart disease, but you don't have a symptom. But yet that's what the Congress was trying to say. You could have an injury that you have a symptom or a manifestation. You don't necessarily have to have both to trigger the right one. How about the particular facts of this case? This is a little bit of an unusual case. In all of the other cases, as I recall, at least that have reached this Court, the child in question was taken promptly to a physician, and the physician was able to interpret what the parents were observing and make observations firsthand as well. This is the fluke case because this is the case where what the parents observed they thought was insignificant, so they didn't even take the child to the doctor for the period from July 10th to August 30th when the big seizure occurred. Further, you have the irony that the mother, according to the record, is a nurse. So even with whatever her exact medical training was and her concern as a parent, didn't think it was even worth taking this infant back to the very physician who on the 10th of July had administered the multiple vaccines in a typical injection. So this case is sort of an unusually sympathetic case because here we're saying that because the mother didn't react in the way that a neurological specialist might have reacted to the observations of July 10th, July 11th, July 12th, and so forth, no recovery is possible because the filing was too late. As argued extensively by Mr. Kruger in the gray brief and also in his blue brief, but particularly in the gray brief, that puts a very heavy burden on the parent to be better than the average doctor, perhaps, and here even a medically trained parent didn't see the problem, and so she didn't even take the child in. I gather from Corbier that if the child had been taken in to him the day after the shot or the very same day after the shot, he would have thought big trouble, big trouble, either seizures or something close to a seizure. At the very least, investigate, test, examine, act. But in the end, in this case, it's the failure of the parent to spot the trouble that ends up causing the result. That's why the burden shouldn't be on the parent for the triggering of the statute of limitations. The burden shouldn't be, you shouldn't look at the mindset of the parent. It should be what the medical community deems to be the first symptom. Yes, but if a medical community would deem something to be an onset, but a parent would have no clue that that's so, then the parent wouldn't take the child in, and therefore the doctor would never see the problem. Correct, but say you have a parent who is a little bit more medically savvy who does take his child in, and the doctor says, you know, this is a little strange. I think that we need to have further evaluation. The limitations would begin to run there. So you have the same injury, same child, same injury, but the limitations period is going to be applied differently given the medical savvy of a parent. Mrs. Markovich was a nurse. She had some medical savvy, and even she didn't recognize it. Correct, but what if she had been a doctor? I mean, would it have been fair if she had been a doctor who, a neurologist even, who says, there's something wrong with my child here. I want further evaluation. Would it be fair then to run the statute of limitations in that example but not in this case? No, you need to have a uniform application of the statute of limitations that looks at not what the parent perceives is the onset of injury, but what the medical community has to say. Well, what about a reasonable parent? You have a stronger point when you say, well, we can't have a whole lot of different standards based on the degree of what we're calling medical savvy of this parent versus the next parent versus some other parent. But how about if you use the sort of tort law concept of the reasonable parent? If a reasonable parent would not have suspected trouble and not taken the child in, then maybe the clock shouldn't be running. What's wrong with the reasonable parent standard? How do you define reasonable? I understand you're taking the child in. Well, it's the same way courts do all the time in myriad situations. It's not perfect. It may be only an approximation, but it gets beyond the pure person-by-person subjectivity of what somebody actually perceived to ask, well, what would a normal parent, what would the average parent do in this circumstance? And if the average parent would not take the child in, would not think anything was wrong, then we would say we don't have symptoms or manifestations. I think, Your Honor, that that's getting away from the language of the act. The act says first symptom or manifestation of onset. That is a medical, I mean, I understand the interpretation is reasonable. But the rest of the phrase is onset of an injury. Correct. This parent didn't think there was an injury. But in this case, they still want to use the July 10 episode as evidence of causation of injury. So how can you look at the fact for one part of the act for purposes of causation but completely ignore it for purposes of limitation? That's just not proper statutory construction. You have to apply the facts the same through all parts of the act. So that's why you need to have an objective standard to limitations. Well, I'm agreeing to an objective standard. The question is whether it's the medical community as a whole or whether it's a reasonable parent. And you haven't said to me why. I don't think you've said why a reasonable parent isn't as good as the medical community at large. I'm not saying that it's not as good. It's just that's, again, you're looking at the mindset of a parent for the treatment and statutory limitations. But yet you're going to be using the same facts and saying, OK, we're going to apply a reasonable parent standard and say we're not going to hold a reasonable parent. Mrs. Markovitch shouldn't have appreciated the significance of the July 10 eye blinking. But yet this July 10 eye blinking is so significant that we're going to allow the petitioners to use this evidence to establish causation. That's just— Can we tie that theory to manifestation, the language of manifestation of the onset? You mean— I'm wondering if there is a way to bring the perception of injury into the equation for the running of the statute of limitations by use of the statutory language manifestation of onset. Again, I come back to the danger of using the perception of the parents just to trigger the running of the statute of limitations. Manifestation of injury— Because the language first symptom is also there. The language of first symptom is also there, correct. And I think— But, you know, it's a remedial statute. The largesse of the Congress provides lots of money to these families who are stricken with severe and ongoing medical bills because of these terrible conditions that the occasional child suffers for years as a result of a bad effect of otherwise wonderful vaccines. No question. It's remedial and— So why shouldn't we read the statute in the way that's most beneficial to that legislative purpose of providing financial relief to these severely impacted families? Well, because we have, first, an issue of sovereign immunity when it applies to limitations. I agree with you, Your Honor, that the statute is remedial and should be generous to petitioners once they establish their jurisdiction and are properly in the program. But in terms of actually getting into the courtroom, that should not be remedial. We have issues—the United States is the defendant here, and we have issues of sovereign immunity in that respect. Well, nobody is saying that we should do equitable tolling and we should pretend that the limitations period is three years plus several months. The only question is when you apply the rigid three-year time limit, what event starts the clock running? That's not monkeying with sovereign immunity. That's exactly applying what Congress ordered us to apply, not one day after three years, but three years that starts when? When the medical community deems an injury to have its own effect. Even for a child who was never taken to the medical community at the time? I understand that the application of the statute of limitations in cases such as this—again, we're only talking about a 50-day difference here. But there are cases in the program where we have months where an injury is manifesting itself, for lack of a better word, and the parents don't appreciate it. I understand that the statute of limitations, as it applies to certain cases, can be harsh. Are parents ever reasonable in the treatment of illness of their children? Exactly. Again, is it fair to run the statute of limitations when a parent is a doctor as opposed to when a parent is a factory worker? No, we need some kind of uniformity here. But if the standard is the medical community, what the medical community would understand, then aren't you reading the statute as if it says that the date of occurrence of the first symptom or onset? You're reading out manifestation. No, we read the statute— Because it's just either the symptom or the onset of the injury, as recognized by the medical community. No, I think that's how Judge Butte would read this. We read the statute as really the first symptom of onset or the first manifestation of onset. But it's the manifestation word, and I think that's what Judge Rader was suggesting a moment ago. Doesn't that have some sense of meaning that speaks to the parent? No. Manifestation of injury to whom? To the medical community. But the medical community doesn't see this child. The parent sees the child. It doesn't matter— The doctors don't see that she has rapid eye blinking. The parent sees that. So the question is, was that a manifestation of onset of some injury to the parent, to someone who could then take action? Again, you're allowing that a parent who doesn't take his or her child to a doctor for whatever reason to get into the program by virtue of limitations, as opposed to a parent who may be— and I don't want to use the word more vigilant, but just have more medical know-how or be more— Let me ask you a hypothetical. Suppose there's a medical condition or disorder that has ten symptoms, and suppose that in some cases the presence of one of those symptoms can be diagnostic, and in other cases you need all ten. It's just very unclear. It's a murky kind of disease. Now, if I understand correctly how you say we must leave this statute, the clock would start to run the moment, the first day, that any one of the ten symptoms showed up. Is that right? If you have, in the medical records and medical testimony, evidence that that is indeed a symptom of the injury. Well, I'm stipulating in the hypothetical that each of these ten symptoms are viewed as indicative of disease X. And then I'm saying, suppose we have a case where one of the ten symptoms is observed and none of the others. Under your reading of the statute, the clock starts the first day that any one of the ten symptoms shows up. Yes, sir. Whether or not that's diagnostic. Yes, sir. Because if you required all ten symptoms, then you're reading into Section 1682 evidence of diagnosis. That language is not there. So, in other words, we should read symptom as if Congress has said any symptom. First symptom. Yeah. The first observation of any symptom. That is ultimately concluded to be a symptom of that injury. Yes, sir. Okay. Thank you. Thank you. Mr. Kruger, you have restoration of two minutes. Thank you, Your Honor. The running of this statute of limitations, it has to be linked to the people who are in the trenches and dealing with this. It has to be linked to a parent. The trouble is, you say too much. Maybe it should have been linked to the parent. But when you say it has to be linked to the parents, I suppose the answer is, well, Congress can do it any which way they want. And unless it's unconstitutional, that's the way that's going to apply. Now, here, Congress has chosen certain words, and we've all been debating them and trying to understand them. But Congress has said symptom or manifestation, or seems to imply that if you have either manifestation of the onset of an injury or a symptom of onset of an injury, that the clock is running. They could have done it differently, but they didn't use different words. So given the words that Congress actually used, how can we help you? Well, Your Honor, the whole purpose of this act requires— No question. No question. But still, we have to apply the words Congress actually selected as best we can understand them in the context of the statute, etc. But Congress certainly could not have intended for the clock to start running when nobody knows anything has happened. Nobody knows. Well, why do you say that? I mean, maybe a wiser Congress wouldn't have so intended, but the actual Congress that passed this statute, who knows what they intended or predicted or understood or assumed? We have no evidence at all of that. There has to be a reasonableness standard. There has to be a standard where it's reasonable that someone should have suspected, not that the vaccine did something, but that something is abnormal with their child. Well, if Congress agreed with you, wouldn't they have written the statute to say, runs from when the parent recognizes that what they're observing is the onset of an injury? Don't you really need the doctor as the objective gatekeeper of a parent's subjective and unschooled observations? The doctors are the ones who know the medical implications. Absolutely. They know what a symptom is, they know what an onset is, they know what a manifestation is. Absolutely. Parents don't. A doctor could take what a parent would think as something completely normal for a child and make something of it and take that information. As occurred here with two years of lead time to make the statute of limitations. But we don't know from the record if that was relayed to the parents. In the Bryce case, that was a situation where the doctor actually said, you need to file a claim. And that was five months before the running and the parents didn't do anything. In the Sentness case, they allowed a situation where the doctor linked the original actions where the child was even eating cardboard boxes and they didn't start it. There's no point in discussing that case. That's not even adjudicated yet at the trial level, much less on appeal. That's a case to be debated some other day. And I'm sure it will. But it's informative. It can be used to show how difficult these cases are. And it's not—the running of the statute of limitations is not always black and white. There are gray areas and there has to be some fairness. The whole purpose of this act was to— Well, the problem with that argument is that it hints at equitable tolling. But in Bryce, we held that we can't do equitable tolling. And this panel, I think, is quite powerless to disagree with the decision in Bryce. So that sort of flexibility is not available. Some flexibility that might have been available, Congress precluded by choosing the statutory terms symptom and manifestation. But those were the ones it chose, and we're obligated to follow what it chose. I mean, I hate to say it, but it may be that the only source of a remedy for people in the position of your client is for Congress to change the law either by lengthening the statute of limitations or by changing the terms of what triggers the running of the limitations period. Your Honor, I think it can be done without Congress. I think the two standards that the court needs to apply to run the statute of limitations can be interpreted in this case to hold that the August 30th event triggered it. Not the July 10th event, because the July 10th event was only significant in a causation argument based upon hindsight. And on July 10th, these parents thought their child was merely tired, a runny nose, a fever. Are we going to say that that is automatically a common side effect? Well, you would have a much stronger argument if the statute of limitations were 60 days or something like that. But when the Congress has already given people three years to figure it out, now obviously every child is taken to a doctor more than once every three years of this age. As I recall, you go every few months on some kind of regular schedule for inoculations or checkups or whatnot. So the danger of this kind of situation stringing out over a long period of time is actually quite slight. It doesn't change this case, but it's not likely to recur very commonly because of the frequency with which infants are taken to doctors on a routine basis. And all I can say, Your Honor, is that this is a very unique case. And as far as I can tell, it's the first with this fact pattern to get to this level. All right. Well, I think the case has been well exposed and debated by both sides. We thank both counsel. We'll take the case under advisement. Thank you.